UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

JOHNNY TIPPINS,

        Plaintiff,             Case No. 1:20-cv-426

v.                                    Honorable Robert J. Jonker

K. HOLDEN et al.,

        Defendants.
_____/

**OPINION DENYING LEAVE
TO PROCEED *IN FORMA PAUPERIS* - THREE STRIKES**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff seeks leave to proceed *in forma pauperis*. Because Plaintiff has filed at least three lawsuits that were dismissed as frivolous, malicious or for failure to state a claim, he is barred from proceeding *in forma pauperis* under 28 U.S.C. § 1915(g). The Court will order Plaintiff to pay the $400.00 civil action filing fee applicable to those not permitted to proceed *in forma pauperis*. This fee must be paid within twenty-eight (28) days of this opinion and accompanying order. If Plaintiff fails to pay the fee, the Court will order that this case be dismissed without prejudice. Even if the case is dismissed, Plaintiff must pay the $400.00 filing fee in accordance with *In re Alea*, 286 F.3d 378, 380-81 (6th Cir. 2002).

**Discussion**

The Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which was enacted on April 26, 1996, amended the procedural rules governing a prisoner's request for the privilege of proceeding *in forma pauperis*. As the Sixth Circuit has stated, the PLRA was "aimed at the skyrocketing numbers of claims filed by prisoners–many of which are

meritless–and the corresponding burden those filings have placed on the federal courts." *Hampton v. Hobbs*, 106 F.3d 1281, 1286 (6th Cir. 1997). For that reason, Congress created economic incentives to prompt a prisoner to "stop and think" before filing a complaint. *Id.* For example, a prisoner is liable for the civil action filing fee, and if the prisoner qualifies to proceed *in forma pauperis*, the prisoner may pay the fee through partial payments as outlined in 28 U.S.C. § 1915(b). The constitutionality of the fee requirements of the PLRA has been upheld by the Sixth Circuit. *Id.* at 1288.

In addition, another provision reinforces the "stop and think" aspect of the PLRA by preventing a prisoner from proceeding *in forma pauperis* when the prisoner repeatedly files meritless lawsuits. Known as the "three-strikes" rule, the provision states:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under [the section governing proceedings *in forma pauperis*] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The statutory restriction "[i]n no event," found in § 1915(g), is express and unequivocal. The statute does allow an exception for a prisoner who is "under imminent danger of serious physical injury." The Sixth Circuit has upheld the constitutionality of the three-strikes rule against arguments that it violates equal protection, the right of access to the courts, and due process, and that it constitutes a bill of attainder and is *ex post facto* legislation. *Wilson v. Yaklich*, 148 F.3d 596, 604-06 (6th Cir. 1998).

Plaintiff has been an active litigant in the federal courts in Michigan. In more than three of Plaintiff's lawsuits, the federal courts have entered dismissals on the grounds that the cases were frivolous, malicious, and/or failed to state a claim. *See Tippins v. Parish et al.*, No. 1:19-cv-781 (W.D. Mich. October 15, 2019); *Tippins v. NWI-1, Inc. et al.*, No. 1:16-cv-10140 (E.D. Mich.

Aug. 12, 2016); *Tippins v. Caruso et al.*, No. 2:14-cv-10956 (E.D. Mich. Oct. 14, 2015).  All of Plaintiff's dismissals were entered after enactment of the PLRA on April 26, 1996.

Moreover, Plaintiff's allegations do not fall within the "imminent danger" exception to the three-strikes rule.  28 U.S.C. § 1915(g).  The Sixth Circuit set forth the following general requirements for a claim of imminent danger:

> In order to allege sufficiently imminent danger, we have held that "the threat or prison condition must be real and proximate and the danger of serious physical injury must exist at the time the complaint is filed." *Rittner v. Kinder*, 290 F. App'x 796, 797 (6th Cir. 2008) (internal quotation marks omitted).  "Thus a prisoner's assertion that he or she faced danger in the past is insufficient to invoke the exception." *Id*. at 797-98; *see also* [*Taylor v. First Med. Mgmt.*, 508 F. App'x 488, 492 (6th Cir. 2012)] ("Allegations of past dangers are insufficient to invoke the exception."); *Percival v. Gerth*, 443 F. App'x 944, 946 (6th Cir. 2011) ("Assertions of past danger will not satisfy the 'imminent danger' exception."); *cf.* [*Pointer v. Wilkinson*, 502 F.3d 369, 371 n.1 (6th Cir. 2007)] (implying that past danger is insufficient for the imminent-danger exception).
>
> In addition to a temporal requirement, we have explained that the allegations must be sufficient to allow a court to draw reasonable inferences that the danger exists.  To that end, "district courts may deny a prisoner leave to proceed pursuant to § 1915(g) when the prisoner's claims of imminent danger are conclusory or ridiculous, or are clearly baseless (i.e. are fantastic or delusional and rise to the level of irrational or wholly incredible)." *Rittner*, 290 F. App'x at 798 (internal quotation marks and citations omitted); *see also Taylor*, 508 F. App'x at 492 ("Allegations that are conclusory, ridiculous, or clearly baseless are also insufficient for purposes of the imminent-danger exception.").

*Vandiver v. Prison Health Services, Inc.*, 727 F.3d 580, 585 (6th Cir. 2013).  A prisoner's claim of imminent danger is subject to the same notice pleading requirement as that which applies to prisoner complaints.  *Id*.  Consequently, a prisoner must allege facts in the complaint from which the Court could reasonably conclude that the prisoner was under an existing danger at the time he filed his complaint, but the prisoner need not affirmatively prove those allegations.  *Id.*

Plaintiff alleges a series of purported constitutional violations.  Plaintiff is housed at the Oaks Correctional Facility (ECF), where he is a participant in the START Unit, an

3

alternative-to-segregation program for prisoners diagnosed with a serious mental illness. The program provides special counseling, programming, and incentives designed to reward a prisoner's positive adjustment, with the goal of reintegrating the prisoner into the traditional general population. *See* MDOC Director's Office Memorandum (DOM) 2020-20 (eff. Jan. 1, 2020). Under the Start Plan, prisoners proceed through four stages, based on behavior, with the goal of becoming eligible for placement in the general population. *Id.*

Plaintiff complains that, on April 2, 2020, he was placed in segregation at the request of Defendant Prisoner Counselor K. Holden, ostensibly because Plaintiff was belligerent and disrespectful. Plaintiff alleges that no misconduct ticket was issued and that he did not have an opportunity to challenge the placement, allegedly in violation of his right to due process. He acknowledges, however, that, before he was moved, he met with the SCC (Security Classification Committee), which is responsible for classifying a prisoner to administrative segregation. Mich. Dep't of Corr. (MDOC) Policy Directive (PD) 04.05.120 ¶ I.

Plaintiff filed a grievance about his transfer to segregation. Defendant Resident Unit Manager McCary denied the grievance at Step I, concluding that Plaintiff had been "staged down" in the START Program because he was belligerent and disrespectful to staff. (Step-I Grievance Response, ECF No. 1-1, PageID.9.) McCary also noted that Plaintiff had supplied no evidence or witnesses to support his claim that he was not belligerent. (*Id.*) Defendant Administrative Deputy Warden Spencley signed off on the Step-I grievance. (*Id.*) Plaintiff appealed to Step II. Defendant Warden L. Parish denied the Step-II grievance, with an explanation that Plaintiff was staged down based on his behavior. (Step-II Grievance Response, ECF No. 1-1, PageID.11.)

Plaintiff complains that he has been in segregation for 30 days. While in segregation, he has only one hour in which to make phone calls and has outside exercise in a small yard, separated from other inmates. He complains that Defendants Spencley and Parish failed to remove him from segregation. He also alleges that Defendant Holden ordered him to segregation in retaliation for his having filed unspecified grievances against Holden.

Plaintiff also complains that Prison Counselor Maseta (not a Defendant) announced on April 29, 2020, that inmates who wished to go to 3-Bock should press their buttons. Plaintiff did so, but he was not moved. Other prisoners were moved, and Plaintiff believed a spot remained open. He raised the issue of his transfer with the SCC on May 5, 2020, and he was advised that they needed to talk with Defendant Holden, after which they would let him know of the next opportunity.

Plaintiff contends that he is a chronic-care patient (hypothyroidism, hypertension, and pre-diabetes) who is in imminent danger of contracting COVID-19, because unnamed officers place him in handcuffs and search him without wearing gloves.[1] He also alleges that not all MDOC staff wear masks when delivering meals. Plaintiff acknowledges that all ECF inmates were tested on May 11, 2020, but he complains that staff members were not tested until a later date.

Plaintiff seeks a transfer to a different unit or prison. He also seeks damages against Defendant Holden for violating his rights under the First and Fourteenth Amendments and

---

[1] Although the Court does not make any determination on the issue, it notes that experts such as the Centers for Disease Control (CDC) and the World Health Organization (WHO) recommend that the public not wear disposable gloves for day-to-day activities, unless caring for someone who is sick or cleaning and disinfecting. Unnecessary use of disposable gloves wastes a scarce resource. Regularly washing bare hands typically offers more protection than wearing rubber gloves. Gloves become contaminated as easily as hands but tend to lead to a false impression of safety, resulting in the exercise of reduced caution. *See* CDC recommendation, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/gloves.html (visited May 27, 2020); WHO Facebook query response, https://www.facebook.com/WHO/photos/a.750907108288008/2988788904499806/?type=3&theater (visited May 27, 2020); *see also* Cleveland Clinic online publication, https://health.clevelandclinic.org/why-you-shouldnt-wear-gloves-to-the-grocery-store/.

damages against the other Defendants for failing to resolve the incident with Holden. He seeks unspecified changes to protect him from being at risk from COVID-19.

The primary complaint Plaintiff raises is that Defendant Holden directed that he be stepped-down into administrative segregation, purportedly without due process and in retaliation for Plaintiff's unspecified prior grievances. Plaintiff's allegations against the remaining Defendants are limited to their failures to correct Holden's allegedly improper order to place Plaintiff in segregation. With respect to these claims, Plaintiff's allegations involve only Defendant's past conduct, which cannot be deemed imminent danger. *Vandiver*, 727 F.3d at 585. Nor can a non-Defendant's past failure to permit Plaintiff to transfer to a different unit be deemed imminent danger.

Plaintiff's only allegations that arguably implicate imminent danger are those suggesting that his continued placement in segregation creates a risk to Plaintiff of contracting COVID-19. Even assuming that the allegations state a proper claim against one or more Defendants,[2] the allegations fall short of demonstrating that he is in imminent danger of serious physical injury from his placement in segregation.

The MDOC has engaged in active management of its facilities to minimize risks of exposure to the virus within the confines of the prison system. On May 22, 2020, the MDOC announced that it had completed testing of every prisoner in its 29-prison system in less than 15 days. *See* May 22, 2019, MDOC Press Release, https://www.michigan.gov/corrections/0,4551,7-119-1441_26969-529997--,00.html (last visited May 27, 2020). A total of 1,306 COVID-19 tests have been conducted on the 1,108 prisoners housed at ECF. Of those tests, only nine have come

---

[2] Plaintiff makes no allegations that the named Defendants were among the officers who touched him with bare hands or otherwise failed to take precautions. Plaintiff has not sued any individual correctional officer for placing him in imminent danger.

back positive; the remainder were negative, and none are pending. (*See* https://medium.com/@MichiganDOC/mdoc-takes-steps-to-prevent-spread-of-coronavirus-covid-19-250f43144337.)

Moreover, the MDOC has taken significant measures to limit the threat posed by COVID-19. These measures include:

- Michigan State Industries has been producing masks for prisoners and correctional facility staff to wear. Facilities that had positive cases received masks first, and as production has increased, masks and protective gowns are being sent to all facilities for staff and prisoners. In the meantime, facility staff are permitted to bring their own PPE, such as masks, gloves and gowns.
- All MDOC staff transporting a prisoner on or off grounds are required to be dressed in full personal protective equipment (PPE), which is available for those employees.
- The need for social distancing to help prevent the spread of this virus has included asking organizations to have as many people telecommute as possible, and the MDOC is doing that to the extent we can. Employees should have been authorized to telecommute by their supervisor and supervisors who have questions should contact their leadership. No employees who have been ordered to telecommute should return to their work site unless authorized to do so by their deputy director or Director Washington. Employees who are telecommuting should complete required online training during this time.
- **ALL correctional facility employees must continue to report to work.** Our facilities need to continue operating as close to normal as possible for the safety of those both outside and inside the institution. We need to continue to keep prisoners engaged and occupied in a productive manner to ensure the stability, safety and security of our facilities. Thank you to our correctional facility staff for all they do to keep the citizens of our state safe.
- Visitation at facilities statewide has been suspended. In connection with this, face-to-face college classes at all facilities also has been suspended. This is a proactive step to keep all staff and prisoners safe. The MDOC will work with higher education institutions willing and able to deliver classes as correspondence courses. Core programming and school classes taught by MDOC staff will continue.
- Anyone entering facilities will be subject to enhanced screening prior to entering. This includes answering screening questions and having their temperatures taken. Anyone suspected of having symptoms will not be allowed in the facility.
- Outside contractors for substance abuse programming will be allowed inside and will be screened upon entry per the screening protocol. Attorney visits will continue to be authorized.
- The MDOC will continue to process paroles and release prisoners as scheduled, however, Parole Board lifer and commutation public hearings will be postponed.
- During this time, transfers of prisoners or staff between facilities will not be authorized without the approval of the Assistant Deputy Director or higher.
- Corrections Transportation Officers will be reassigned to facilities to augment custody staff as determined by Assistant Deputy Directors.

7

- Most construction projects have been placed on hold for 60 days. Each project will be evaluated on a case-by-case basis.
- No out-of-state business travel will be allowed through May 15. All in-state business travel should be for essential matters only.
- Staff are encouraged to use phone calls, email and teleconferencing in place of in-person meetings when possible. Any necessary in-person meetings should be limited as much as possible and the size of the meeting should be reduced to allow for attendees to stay the recommended 6-foot distance apart.
- All facilities have received approval from the regional sanitation officer to use bleach during facility cleaning. Additional soap is being provided for prisoners and in the bathrooms. Cleaning products are available to clean commonly-used areas and phones before and after use.
- Facility healthcare staff will meet with prisoners who have presented with symptoms of coronavirus. The MDOC does not make the diagnosis of the coronavirus. The department is following the Michigan Department of Health and Human Services protocol. If a prisoner has symptoms and meets the criteria for testing, the MDOC will seek permission from the local health department in the county the prison is in to conduct a test utilizing a test kit. A limited number of test kits have distributed to all MDOC facilities, but can only be used after the MDHHS authorizes the test.
- As the state works to limit the spread of the virus, we caution employees not to let fear lead to discriminatory actions against any individuals based on their disability, race or ethnicity. If you have experienced or witnessed discriminatory harassment or discrimination, we want you to know it will not be tolerated and we strongly encourage you to report it by calling the MDOC Equal Employment Opportunity Office at 1-800-326-4537, 517-335-3654, or by contacting MDOC EEO Officer Toya Williams at 517-335-4125 or williamst8@michigan.gov.

(*Id.*) Further, the MDOC issued a COVID-19 DOM on April 8, 2020, and issued a revised DOM on the subject on May 26, 2020, *see* MDOC DOM 2020-30R2 (eff. May 26, 2020) (outlining specific precautions to be taken by staff members, including the use of personal protective equipment and hand sanitizer), and again on May 27, 2020, *see* MDOC DOM 2020-30R3 (eff. May 27, 2020) (same).

While Plaintiff suggests that one or more unidentified guards has handcuffed him or searched him without gloves, he neither sues these individuals nor alleges facts suggesting that practices in the segregation unit are different than those in the facility as a whole or that moving him would reduce his risks of exposure. Indeed, moving prisoners to new cells creates additional

8

risks, as recognized in DOM 2020-30R3, which expressly states that "[c]ell moves shall only be made if absolutely necessary (e.g., medical, PREA)." (*Id.* at 5.)

Further, Plaintiff does not allege that he has come into contact with any individual who has COVID-19. In fact, by being placed in segregation, Plaintiff has less exposure to either guards or prisoners than he would in any other housing unit. As Plaintiff alleges in his complaint, he is confined to his cell for 23 hours each day, and his meals are delivered to him. He is rarely transferred by guards to other areas of the prison, so he comes into little contact with them. And he does not exercise with other individuals.

Although the Court is sympathetic to Plaintiff's general concern about the COVID-19 virus, speculation about the mere possibility that he will become infected by the virus does not constitute imminent danger. Therefore, § 1915(g) prohibits Plaintiff from proceeding *in forma pauperis* in this action. Plaintiff has twenty-eight (28) days from the date of entry of this order to pay the entire civil action filing fee, which is $400.00. When Plaintiff pays his filing fee, the Court will screen his complaint as required by 28 U.S.C. § 1915A and 42 U.S.C. § 1997e(c). If Plaintiff does not pay the filing fee within the 28-day period, this case will be dismissed without prejudice, but Plaintiff will continue to be responsible for payment of the $400.00 filing fee.

Dated:   May 28, 2020          /s/ Robert J. Jonker
                               ROBERT J. JONKER
                               CHIEF UNITED STATES DISTRICT JUDGE

**SEND REMITTANCES TO THE FOLLOWING ADDRESS**:

Clerk, U.S. District Court
399 Federal Bldg.
110 Michigan St., N.W.
Grand Rapids, MI 49503

**All checks or other forms of payment shall be payable to "Clerk, U.S. District Court."**